**United States Bankruptcy Court**
**District of South Dakota**

**Charles L. Nail, Jr.**
**Bankruptcy Judge**



_____

Federal Building and United States Post Office                             Telephone: (605) 945-4490
225 South Pierre Street, Room 211                                                   Fax: (605) 945-4491
Pierre, South Dakota 57501-2463

February 10, 2009

Jason W. Shanks, Esq.
Attorney for Plaintiff
Post Office Box 88738
Sioux Falls, South Dakota  57109-8738

Laura L. Kulm Ask, Esq.
Attorney for Debtors-Defendants
Post Office Box 966
Sioux Falls, South Dakota  57101-0966

        Subject:   *First Midwest Bank–Deerfield Branches v. George Wallace Beeler, Jr. and Carolyn Jeanne Beeler* (*In re Beeler*), Adv. No. 08-4006; Chapter 7, Bankr. No. 07-40603

Dear Counsel:

        The matter before the Court is the Motion for Summary Judgment filed by Debtors-Defendants George Wallace Beeler, Jr. and Carolyn Jeanne Beeler.  This is a core proceeding under 28 U.S.C. § 157(b)(2).  This letter decision and accompanying order and judgment shall constitute the Court's findings and conclusions under Fed.R.Bankr.P. 7052.  As discussed below, Debtors-Defendants' motion will be granted.

        **Facts.**  In their brief (doc. 20-1) in support of their Motion for Summary Judgment (doc. 20), Debtors-Defendants George Wallace Beeler, Jr. and Carolyn Jeanne Beeler ("Debtors") set forth the following facts:[1]

        1. [Debtors] purchased their homestead located at . . . Harrisburg, South Dakota in April 2001 for $189,900.

        2. On or around February 18, 2005, [Debtors] had a house fire caused by a faulty bathroom ceiling fan.  Then again on or around December 17, 2005, [Debtors] had a second house fire.

        3. [Debtors] owned a 1965 Ford Mustang, which was stored at all times in the garage attached to [Debtors'] homestead.

        4. Said Mustang was drivable when [Debtors] purchased it.  At the time of purchase, said Mustang was complete with an engine, the interior, and wheels.

_____

        [1] Debtors' citations to the record are omitted.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 2

5. [Debtor] George Beeler started restoring said Mustang in approximately the winter of 2005. During the restoration process, it was determined that there was a crack in the engine.

6. After the two (2) above-stated house fires, [Debtors] had to gut the Mustang so [as] to have the soot cleaned from the seats and the interior.

7. [Debtor Carolyn Beeler] prepared the personal financial statement . . . [attached] as . . . Exhibit "A" . . . to [First Midwest Bank – Deerfield Branches' ("First Midwest")] Requests for Admissions.

8. Said financial statement is neither signed, nor was required by [First Midwest] to be signed, by [Debtors].

9. [First Midwest] states that the majority of the loans it approves would have a written personal financial statement in the file that were signed by the debtors.

10. Said financial statement was the only one completed and held in [First Midwest]'s file, and the only one [First Midwest] had prior to approving the financing with [Debtors].

11. On said personal financial statement, [Debtors] listed under the column Assets, "Automobiles: Sub & 65' Mustang[,"] with a combined value of $65,000.

12. [Debtor Carolyn Beeler] testified in her deposition [that] "Sub" was a suburban that was purchased for $40,000-$41,000.

13. In [First Midwest]'s Complaint, [First Midwest] states that it "would not have approved the loans with [Debtors] if the value on the 1965 Mustang had not been falsely reported[."]

14. In addition, [First Midwest] states, through Molly Jackson, that the loans with [Debtors] would not have been approved without the value on the 1965 Mustang value stated, or even presented to [First Midwest]'s loan committee. That the Mustang was needed to "make the deal work[."]

15. [First Midwest] never inspected, nor even requested to inspect, the Mustang before granting financing to [Debtors].

16. [First Midwest] never appraised, or order[ed] an appraisal on [Debtors]' Mustang either before the loans were approved, or any time after.

17. [First Midwest] never inquired into whether the Mustang was drivable or not before granting the financing to [Debtors].

Re: *First Midwest Bank−Deerfield Branches v. Beeler*
February 10, 2009
Page 3

18. [First Midwest] never inquired with the [Debtors] on the mileage of the Mustang before granting the financing to [Debtors].

19. [First Midwest] never inquired with [Debtors] on when they purchased the Mustang or the purchase price of it before granting the financing to [Debtors].

20. [First Midwest] never asked what condition the Mustang was in, if it was restored, or how [Debtors] came up with the alleged stated value before approving the financing.

21. [First Midwest] never inquired what size engine was in it or what specialty items it would have that would make it worth that alleged value.

22. [First Midwest] states that it never uses appraisers on vehicle[s], but instead relies on the NADA retail book.

23. [First Midwest] was listed as a creditor in [Debtors]' bankruptcy and was served notice of [Debtors'] intent to surrender the homestead as detailed on the Statement of Intentions that was served upon [First Midwest] on October 17, 2008, as proven in Certificate of Service filed in this case.

24. [First Midwest] was aware that [Debtors] vacated the property and had surrendered it to the first mortgage holder.

25. [Debtors] installed a sump pump in the house when they purchased it in 2001.  The previous owner did not have one because it was the highest place out there and it was on gravel, and had lived there for a little over a year without any water damage.

26. [Debtors] put in a sump pump as a precaution, but they never had any water problems while living there, and they hardly ever heard it run.

27. [Debtors] contacted the first mortgage holder directly by telephone on or around October 15, 2007, to inform it that it would need to turn the electricity back on and to secure their interest because they moved out of the property.

28. [Debtors] were not sure if they could gain access to the property after surrendering it because the doors were locked and orange stickers were on the house.

29. [First Midwest] did not contact the first mortgage holder before entering the homestead, after knowing it was surrendered to that mortgage holder.

30. [First Midwest] never contacted the first mortgage holder to inquire

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 4

on repairs that it was doing to the house.

31. [First Midwest] never contacted the first mortgage holder about the water damage, even though [First Midwest] was aware it was surrendered to the first mortgage holder.

32. [First Midwest] never contacted the first mortgage holder to gain access to inspect the property, even though [First Midwest] was aware it was surrendered to the first mortgage holder.

33. [First Midwest] never contacted the first mortgage holder about insurance on the property, even though [First Midwest] was aware it was surrendered to the first mortgage holder.

34. [First Midwest] never contacted the first mortgage holder, even after notice of [Debtors'] surrender of the property, to inquire on any repair to the damage that the mortgage holder had done, or any clearing out of the water, or any steps that it took to preserve the property.

35. Homeowner's insurance coverage on the homestead was cancelled on or around December 19, 2007, after the water damage.

In its brief (doc. 31) in opposition to Debtors' Motion for Summary Judgment, First Midwest did not specifically challenge any of the foregoing facts. It instead set forth its own version of the facts:[2]

1. [Debtor Carolyn Beeler] contacted First Midwest in order to obtain two business loans for a daycare and children's barber shop, which she was going to call Busy Bees Child Care Center ("Busy Bees") and Buzz N Cuts.

2. The Busy Bees and Buzz N Cuts' loan requests were assigned to loan officer Molly Jackson.

3. [Debtor Carolyn Beeler] requested two loans, one for Busy Bees in the amount of $105,594 and one for Buzz N Cuts in the amount of $23,751.

4. Upon reviewing the business plan and requested loans, it was determined that the business assets alone would not cover the loan debts.

5. The Busy Bees business assets had a projected retail value of $55,000, which equated to a loan value of $33,300 (60% of retail).

6. Buzz N Cuts had business assets with a retail value of $17,395, which was a loan value of $10,437 (60% of retail).

---

[2] First Midwest's citations to the record are omitted.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 5

7. Molly Jackson informed [Debtor Carolyn Beeler] that First Midwest does not place a 100% value on the business assets when determining whether there is sufficient collateral to cover the loan.

8. Molly Jackson then informed [Debtor Carolyn Beeler] that the business assets were insufficient to cover the requested loans and that [Debtor Carolyn Beeler] needed to provide additional collateral to cover the loans.

9. Molly Jackson scheduled a meeting in March 2005 with [Debtor Carolyn Beeler] to go over her personal financial statement in order to determine if there were additional assets that could be used as collateral to secure the loans.

10. Upon reviewing [Debtor Carolyn Beeler]'s personal financial statement, Molly Jackson was able to identify two assets that could be used as collateral for the loans, that being [Debtors]' home and their 1965 Ford Mustang.

11. [Debtor Carolyn Beeler]'s personal financial statement identified the home's appraised value at $302,000 and [Debtor Carolyn Beeler] was informed that it would be necessary for First Midwest to obtain an appraisal on the home in order to determine how much equity there was that could be used as collateral.

12. Prior to closing, Molly Jackson contacted M-Pire Appraisals and requested an appraisal of [Debtors]' home and M-Pire appraised the home at $308,000.

13. There were two prior loans against [Debtors]' home in the amounts of $205,562 and $45,000.

14. After reduction of the prior loans from the appraised value, there was $57,438 in available equity that could be used as collateral for the loans and combining the loan value of the projected business assets of $33,300, plus the $57,438 in equity in [Debtors]' home, there was still insufficient collateral to cover the loan requests.

15. [Debtor Carolyn Beeler]'s personal financial statement identified the Suburban and Mustang as having a value of $65,000.

16. [Debtor Carolyn Beeler] stated that the Mustang was worth $40,000.

17. [Debtor Carolyn Beeler] never informed Molly Jackson or First Midwest that [Debtors] had purchased the vehicle for $3,350 on or around December 8, 2004.

18. [Debtor Carolyn Beeler] did not inform Molly Jackson or First Midwest that the Mustang needed an extensive amount of repairs and that it had not been fully restored.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 6

19. When asked how she determined that the Mustang was worth $40,000, [Debtor Carolyn Beeler] stated that she had gotten an offer in that amount from Frankman's or Franklin's Auto.

20. She then stated to Molly Jackson that she would check with [Debtor George Beeler] and confirm who made the offer and double check that there was not a lien on the vehicle.

21. [Debtor Carolyn Beeler] admitted that she had neighbors who worked for Frankman's Auto who lived just down the road from her who had seen the car and [Debtor Carolyn Beeler] had inquired about its value.

22. Following their meeting wherein they discussed the value of the Mustang, [Debtor Carolyn Beeler] called Molly Jackson back later that day and confirmed the $40,000 offer and that there was no lien.

23. First Midwest does not obtain appraisals on vehicles for the purpose of determining the retail value of vehicles.

24. It is normal business practice in the banking industry and at First Midwest to rely on the financial information provided in a debtor's financial statement.

25. It is normal business practice in the banking industry and at First Midwest that appraisals are not obtained on vehicles used as collateral on loans.

26. First Midwest reasonably relied upon [Debtor Carolyn Beeler]'s representation that the Mustang was a vintage vehicle, that they had received an offer and that the vehicle had a value of $40,000, and that there were no liens against it.[3]

27. [Debtor Carolyn Beeler] admitted that based upon her review of pricing in magazines, a vintage 1965 Mustang would have a fair market value of $40,000.

28. Based upon the personal financial statement and [Debtor Carolyn Beeler]'s representations, the loan value of the Mustang was $32,000 (80% of retail) and provided sufficient additional collateral to cover the Busy Bees and Buzz N Cuts loans.

29. There was also a bus that was later added as collateral which had a retail value of $5,575 and a loan value of $4,460 (80% of retail).

30. Without the loan value of the Mustang, Molly Jackson would not

---

[3] The question of whether First Midwest reasonably relied on Debtor Carolyn Beeler's representations regarding the Mustang is, of course, for the Court to decide.

Re: *First Midwest Bank−Deerfield Branches v. Beeler*
February 10, 2009
Page 7

have presented the Busy Bees and Buzz N Cuts loan proposals to the First Midwest loan committee as there would have been insufficient collateral to cover the requested loans.

31. The Busy Bees and Buzz N Cuts loans would not have been approved without the additional loan value of [Debtors]' Mustang.

32. At the time [Debtor Carolyn Beeler] submitted her personal financial statement to First Midwest, she admits that the Mustang was not worth $40,000.

33. In January 2007, First Midwest learned that Busy Bees and Buzz N Cuts [were] going to be evicted thereby creating an adverse change in [their] financial condition as well as their ability to make loan payments.

34. On or about February 13, 2007, First Midwest hired Rick Overweg to repossess the Mustang.

35. After the Mustang was repossessed, it was discovered that it was not worth $40,000 as it consisted of just the frame, having no interior and no engine.

36. After taking possession of the Mustang, First Midwest had to pay the storage fees and [Debtor George Beeler] was given the option of paying the storage fees that had accumulated on the Mustang in order to get the Mustang back.

37. [Debtor George Beeler] never informed First Midwest that he was willing to pay the storage fees[,] and on September 27, 2007, First Midwest sold the Mustang frame for $662.60 to Rick Overweg and paid Riverside Repossession $600, which was the balance of the storage fees due and owing after the purchase price of the Mustang was offset against the storage bill which had accumulated to $1,262.60.

38. After [Debtors] filed for bankruptcy, Molly Jackson went to the meeting of the creditors which was held in front of Trustee Pierce on November 16, 2007, and at no time prior to, during, or following the meeting of the creditors did [Debtors] inform Molly Jackson or First Midwest that they had discovered water in the basement of their home.

39. First Midwest felt it was necessary to obtain an updated appraisal of [Debtors]' residence.

40. On or about December 4, 2007, [Debtors]' attorney authorized First Midwest to enter [Debtors]' home to conduct an appraisal.

41. Molly Jackson contacted Ace Appraisals to conduct the appraisal and escorted them to the property.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 8

42. Upon entering the home, there was a strong odor and it was determined that there had been extensive water damage in the basement which also caused an extensive amount of mold growth.

43. Upon inspecting the property on December 4, 2007 and considering its condition, Ace Appraisals determined that the property was not marketable in its current condition due to the mold contamination.

44. Following her viewing of [Debtors]' home, Molly Jackson contacted Southeastern Electric Cooperative and inquired as to who authorized the electricity to be disconnected and the date of such disconnection and was informed that [Debtor George Beeler] requested that the electricity to the home be disconnected on September 24, 2007.

45. Molly Jackson also contacted [Debtors]' property insurance carrier and was informed that [Debtors]' home was vacant starting in September 2007 and that the insurance on the property ceased on September 19, 2007.

46. Because of the extensive water and mold damage, First Midwest contacted INTEK to conduct an inspection of [Debtors]' home in order to determine the costs of repair.

47. INTEK determined that the costs of repair were $46,440.75.

48. [Debtors]' home was sold at auction for $234,081.41 and First Midwest received no proceeds from that sale.

49. Pursuant to the Mortgage signed by [Debtors], they had a duty to maintain, protect, and preserve the property and further agreed that they would not abandon the property.

50. Following the water and mold damage to the property, [Debtors] took no steps to protect or repair the property.

51. All of the assets of Busy Bees and Buzz N Cuts were sold to Youth Enrichment Services for $50,000 and such payment was applied to the amounts due and owing on the Busy Bees and Buzz N Cuts loans.

52. Both [Debtor George Beeler] and [Debtor Carolyn Beeler] approved the sale of the Busy Bees and Buzz N Cuts assets.

53. There are no remaining assets or collateral available to sell in order to satisfy the balances due and owing on the Busy Bees and Buzz N Cuts loans.

54. Had [Debtors] maintained, protected, and preserved their residence, the value of the home would not have decreased to $234,081.41.

Re:  *First Midwest Bank−Deerfield Branches v. Beeler*
February 10, 2009
Page 9

> 55. Had [Debtors] maintained insurance on their residence and informed First Midwest of the water damage, such damage could have been repaired or First Midwest could have insured the property or otherwise taken steps to protect and preserve the property and its value.
>
> 56. Because First Midwest was not immediately notified that [Debtors] had vacated the property, that they had turned off the electricity, that they had allowed their insurance to lapse, and that there was water damage to the property, by the time First Midwest became aware of the water and mold problems, it was not economically feasible to repair the property due to the spread of the mold and cost of repair.

In their reply brief (doc. 33), Debtors did not specifically challenge any of the foregoing facts. They instead set forth the following additional facts:[4]

> 1. The undisputed time line in this case will show that [First Midwest] did not reasonably rely on the financial statement provided by Debtors in or around March 2005.
>
> 2. [First Midwest] closes and never requests the title on the Mustang from [Debtors] again.
>
> 3. [First Midwest] sold the Mustang and then discovered that it did not have the title.
>
> 4. [Debtor Carolyn Beeler] informed [First Midwest] that she arrived at the approximate $40,000 value for the Mustang by looking a[t] magazines on what the value would be once it was fully restored.
>
> 5. [First Midwest] sold the Mustang and discovered that it did not have the title, and did not properly perfect on its lien.
>
> 6. The financial statement in this case was present on or around March 2005 by [Debtor] Carolyn Beeler.
>
> 7. The first commercial security agreement between [First Midwest] and [Debtors] was not done until November 18, 2005, with the second done on January 13, 2006, and renewals on March 30, 2006.
>
> 8. No other financial statement was obtained by [First Midwest], nor requested from [Debtors] by [First Midwest] that [First Midwest] could produce.
>
> 9. [First Midwest] states that the loan value of the business assets, after the first loans were written, but before the refinancing, were at $70,000 for Busy Bees and $17,000 for Buzz N' Cuts.

---

[4] Debtors' citations to the record are again omitted.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 10

    10. [First Midwest] stated to [Debtor Carolyn Beeler] that it requested the financial statement as a requirement since she would be a personal guarantee, and that she would need to bring one in to [First Midwest].

    11. [Debtors] filed bankruptcy on October 16, 2007.

    12. [First Midwest] was a creditor listed on their bankruptcy and it did receive notice of Debtors' bankruptcy.

    13. Debtors' address on their schedules, and on the Notice to Creditors sent directly to [First Midwest], stated that they are living in Spicer, Minnesota.

    14. In addition, on or around October 17, 2007, [First Midwest] was sent a copy of Debtors' Statement of Intentions stating that the real property is surrendered.

    15. Furthermore, [First Midwest] has admitted that it was from these bankruptcy papers that they received on or around October 16, 2007, that they were aware that Debtors turned over the real property to the first mortgage holder.

    16. [Debtors] notified the first mortgage holder to safe keep the property and the mortgage holder did so.

    17. [Debtors] were not able to pay their bills and the utilities were shut off.

    18. [Debtors] contacted the first mortgage holder directly by telephone on or around October 15, 2007, to inform it that it would need to turn the electricity back on and to secure their interest because they moved out of the property.

    19. [Debtors] were not sure if they could gain access to the property after surrendering it because the doors were locked and orange stickers were on the house.

Finally, in its supplemental brief (doc. 37), First Midwest referenced certain log notes it obtained from HomEq[5] (doc. 36) and offered the following additional facts:

    [1. T]he log notes indicate[d] that Rich, from the Olson Group[6] contacted HomEq on October 12, 2007 and notified HomEq that [Debtors'] property

---

[5] While it is not identified as such anywhere in the parties' recitations of the facts, HomEq was Debtors' first mortgage holder.

[6] According to the log notes, it appears Rich (no last name given) may have been Debtors' neighbor and insurance agent.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 11

had been vacated and that the insurance had been cancelled.

[2. The log notes do not indicate Debtors] inform[ed] HomEq that they had moved out of the property in September . . . , that they had turned off the electricity . . . , or that their insurance had been cancelled . . . .

[3. The log notes do not indicate Debtor Carolyn Beeler] call[ed] HomEq right away on October 15[, 2007]; rather, HomEq's log indicates that she did not call them until October 17[, 2007], the day after [Debtors] filed for bankruptcy.

[4. The log notes do not indicate Debtors] turn[ed] over the property to HomEq[; they instead indicate Debtors] merely informed it that they were giving HomEq notice for "preservation purposes."

The Court does not necessarily agree all of the foregoing facts are material to the issues before it. However, those are the facts the parties have offered, and those are the facts upon which the Court relied in reaching its decision.

**Summary Judgment.** Summary judgment is appropriate when "there is no genuine issue [of] material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Bankr.P. 7056 and Fed.R.Civ.P. 56(c). An issue of material fact is *genuine* if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (quotes therein). A genuine issue of fact is *material* if it might affect the outcome of the case. *Id.* (quotes therein).

The matter must be viewed in the light most favorable to the party opposing the motion. *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir. 1992) (quoting therein *Matsushita Elec. Industrial Co. v. Zenith Radio*, 475 U.S. 574, 587-88 (1986), and citations therein). Where motive and intent are at issue, disposition of the matter by summary judgment may be more difficult. *Cf. Amerinet*, 972 F.2d at 1490.

The movant meets his burden if he shows the record does not contain a genuine issue of material fact and he points out the part of the record that bears out his assertion. *Handeen v. LeMaire*, 112 F.3d 1339, 1346 (8th Cir. 1997) (quoting therein *City of Mt. Pleasant, Iowa v. Associated Electric Cooperative, Inc.*, 838 F.2d 268, 273 (8th Cir. 1988)). No defense to an insufficient showing is required. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 161 (1970) (citation therein); *Handeen*, 112 F.3d at 1346.

If the movant meets his burden, however, the non movant, to defeat the motion, "must advance specific facts to create a genuine issue of material fact for trial." *Bell*, 106 F.3d at 263 (quoting *Rolscreen Co. v. Pella Products of St. Louis, Inc.*, 64 F.3d 1202, 1211 (8th Cir. 1995)). The non movant must do more than show there is some metaphysical doubt; he must show he will be able to put on admissible evidence at trial proving his allegations. *Bell*, 106 F.3d 263 (citing *Kiemele v. Soo Line R.R. Co.*, 93 F.3d 472, 474 (8th Cir. 1996), and *JRT, Inc. v. TCBY Systems, Inc.*, 52 F.3d 734, 737 (8th Cir. 1995)).

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 12

**Discussion – 11 U.S.C. § 523(a)(2)(B).**  By its complaint (doc. 1), First Midwest is first asking the Court to conclude its claim against Debtors is nondischargeable under 11 U.S.C. § 523(a)(2)(B), which excepts from discharge any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

> use of a statement in writing –
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).[7]  To prevail under § 523(a)(2)(B), First Midwest must prove each of the above elements by a preponderance of the evidence. *First National Bank of Olathe, Kansas v. Pontow* (*In re Pontow*), 111 F.3d 604, 608 (8th Cir. 1997) (citing *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)).

Based on the parties' recitations of the facts, the Court concludes there is no genuine issue of material fact regarding the first four elements.  First Midwest has shown the record establishes Debtor Carolyn Beeler used a written statement (the personal financial statement she prepared and provided to First Midwest), the written statement was materially false (regarding the combined value of Debtors' Suburban and their Mustang), and the written statement was respecting Debtor Carolyn Beeler's financial condition.

Debtors, however, have shown the record establishes First Midwest did not reasonably rely on Debtor Carolyn Beeler's personal financial statement, and First Midwest has not shown there is a genuine issue of material fact regarding that element.

> The determination of the reasonableness of a creditor's reliance is to be made in light of the totality of the circumstances.  Among other things, a court may consider whether there were any red flags that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal

---

[7] While it is not clear from the parties' recitations of the facts that First Midwest actually has a claim against him, Debtor George Beeler personally guaranteed Debtor Carolyn Beeler's businesses' indebtedness to First Midwest.

Re: *First Midwest Bank−Deerfield Branches v. Beeler*
February 10, 2009
Page 13

>investigation would have revealed the inaccuracy of the debtor's representations.

*Pontow*, 111 F.3d at 610 (internal quotations and citations omitted).

First, while Debtor Carolyn Beeler's personal financial statement was dated and presumably prepared on or about February 16, 2005 and was presented to First Midwest in March 2005, the "Busy Bees" loan did not close until November 18, 2005, and the "Buzz N Cuts" loan did not close until January 13, 2006. The personal financial statement was thus approximately eight months old when the first loan closed and approximately ten months old when the second loan closed. First Midwest has not pointed the Court to anything in the record to suggest it asked Debtors to update the personal financial statement prior to either closing. Under the circumstances, First Midwest's reliance on the personal financial statement cannot be said to have been reasonable. *See Sinclair Oil Corp. v. Jones* (*In re Jones*), 31 F.3d 659, 662 (8th Cir. 1994) (citing *First American Bank of Indian River County v. Schraw* (*In re Schraw*), 136 B.R. 301, 304 (Bankr. S.D. Fla. 1992) (if a creditor relies on a stale financial statement and never inquires as to whether the statement actually reflects the debtor's current financial condition, the creditor fails to show reasonable reliance (quoting therein *Barnett Bank v. Ogden* (*In re Ogden*), 119 B.R. 277, 279 (Bankr. M.D. Fla. 1990) (cite omitted))).[8]

Second, there were several red flags that would have alerted an ordinarily prudent lender to the possibility that Debtor Carolyn Beeler's personal financial statement was not accurate. One such red flag was the manner in which she lumped the Mustang with Debtors' Suburban on the financial statement and did not assign a separate value to either until she was compelled to do so by First Midwest. Another red flag was the very nature of the asset itself. A 1965 Mustang could be anything from a 3,000-pound lawn ornament to a mint condition collector's automobile, with the value largely, if not entirely, dependent on the nature, extent, and quality of any restoration. First Midwest has not pointed the Court to anything in the record to suggest Debtor Carolyn Beeler was recognized as an expert regarding such matters. A closely related red flag was the value ascribed to the Mustang. An ordinarily prudent lender might not question an asset valued at $40, $400, or if the loan were large enough, perhaps even $4,000. However, such a lender would certainly want to confirm an asset valued at $40,000 was in fact worth that much, especially if that asset was critical to the lender's decision to make the loan, as First Midwest has stated repeatedly the Mustang was to its decision to make the loans to Debtor Carolyn Beeler's businesses.[9] Even the most scrupulously honest owner might have an inflated

---

[8] The financial statements found to be stale in *Schraw* were presented to the lender in March 1988 and February 1989; the loan was made September 12, 1989. *Schraw*, 136 B.R. at 305.

[9] First Midwest's decision to have Debtors' home appraised proves this point. The potential equity in Debtors' home ($57,438) was not that much greater than the value Debtor Carolyn Beeler assigned to the Mustang.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 14


sense of what such a vehicle was worth.[10]  Another red flag was the means by which Debtor Carolyn Beeler is said to have arrived at a value for the Mustang, *i.e.*, looking at magazines and talking to neighbors.  It seems unlikely an ordinarily prudent lender would accept the opinion of a third party who relied on such sources to value an asset.  It seems even more unlikely such a lender would accept the opinion of an owner who relied on those sources to value an asset.  Yet another red flag was Debtor Carolyn Beeler's readily apparent lack of firsthand knowledge regarding the Mustang.  She had to check with Debtor George Beeler to confirm the alleged $40,000 offer from Frankman's or Franklin's Auto.  She likewise had to check with Debtor George Beeler to confirm there was no lien against the Mustang.  Irrespective of any possible intent to deceive, that lack of firsthand knowledge should have caused First Midwest to seriously question – and seek independent confirmation of – anything Debtor Carolyn Beeler had to say about the Mustang.  One or more of those red flags should have alerted First Midwest to the need for further investigation.[11]

       Third, had First Midwest conducted even the most minimal investigation, that investigation would have quickly revealed the inaccuracy of Debtor Carolyn Beeler's personal financial statement.  While the parties' recitations of the facts are less than clear regarding the condition of the Mustang in March 2005,[12] there is no dispute that it was not worth $40,000 at the time.  Had it contacted the individual or entity who allegedly offered that sum for the Mustang, First Midwest would have learned whether the offer was legitimate and whether that offer provided a rational basis for valuing the Mustang.  Had it simply inspected the Mustang, First Midwest would have learned the Mustang was not worth $40,000 before making the loans to Debtor Carolyn Beeler's businesses.  Had it had the Mustang appraised – as it had Debtors' home appraised – First Midwest would have learned what the Mustang was actually worth before making those loans.

       For these reasons, the Court concludes First Midwest did not reasonably rely on Debtor Carolyn Beeler's personal financial statement.  *Guess v. Keim* (*In re Keim*), 236 B.R. 400, 403 (B.A.P. 8th Cir. 1999) (failure to conduct any investigation and "blind reliance" on the debtor's financial statement was not reasonable).  Debtors are therefore entitled to judgment in their favor on the first count of First Midwest's

---

       [10] One does not have to frequent Benson's Flea Market to know "one man's trash is another man's treasure."

       [11] In its brief, First Midwest argued the fact that Debtor Carolyn Beeler was once a student of First Midwest's vice-president at South Dakota State University and the fact that Debtor Carolyn Beeler had received a state grant from Governor Mike Rounds justified its reliance upon her representations.  In light of all the red flags, the Court disagrees.

       [12] From the record provided, what can be said is when Debtors purchased it, the Mustang had an engine, an interior, and wheels, and it ran.  Following a house fire in February 2005 and a second house fire in December 2005, Debtors had to "gut" the Mustang to clean soot from the seats and the interior.  By the time First Midwest repossessed it in February 2007, it was just a frame, with no interior and no engine.

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 15

complaint.  *Valley National Bank v. Bush* (*In re Bush*), 696 F.2d 640, 644 n. 4 (8th Cir. 1983) ("If an objecting creditor fails to prove every element contained in § 523(a)(2)(B) . . . the debt in question is dischargeable.").[13]

**11 U.S.C. § 523(a)(6).**  First Midwest is also asking the Court to conclude its claim against Debtors is nondischargeable under 11 U.S.C. § 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  11 U.S.C. § 523(a)(6).  To prevail under § 523(a)(6), First Midwest must prove by a preponderance of the evidence its claim is for an injury that is both a "willful injury" and a "malicious injury."  *Blocker v. Patch* (*In re Patch*), 526 F.3d 1176, 1180 (8th Cir. 2008) (citing *Fischer v. Scarborough* (*In re Scarborough*), 171 F.3d 638, 641 (8th Cir. 1999)); *see Sells v. Porter* (*In re Porter*), 539 F.3d 889, 893-94 (8th Cir. 2008).

In considering a complaint to determine dischargeability under § 523(a)(6), the Court must employ a two-step analysis.

> The plain language of § 523(a)(6) requires courts applying the exemption to first determine exactly what "injury" the debt is "for," and then determine whether the debtor both "willful[ly] and malicious[ly]" caused that "injury."

*Patch*, 526 F.3d at 1181.[14]

In this case, First Midwest has not clearly defined either the debt or the injury that implicates § 523(a)(6).  However, based on the parties' recitations of the facts, the Court concludes the debt in question is First Midwest's deficiency claim, and the injury giving rise to that debt is First Midwest's not receiving payment in full on its claim against Debtors.  *Cf. Patch*, 526 F.3d at 1181.

The first hurdle First Midwest must overcome is the requirement that an action under § 523(a)(6) be based on an intentional tort.  *Geiger v. Kawaauhau* (*In re Geiger*), 113 F.3d 848, 853 (8th Cir. 1997), *aff'd*, 523 U.S. 57 (1998).  The question of what constitutes an intentional tort is determined under state law.  *Prewett v. Iberg* (*In re Iberg*), 395 B.R. 83, 90 (Bankr. E.D. Ark. 2008) (citing *Lockerby v. Sierra*, 535 F.3d 1038, [1040] (9th Cir. 2008)).  In its complaint, First Midwest identified several acts that it alleged implicated § 523(a)(6): Debtor Carolyn Beeler's misstating the value of the Mustang; Debtors' shutting off the electricity to their home; and Debtors' failing to repair the water damage to their home or otherwise take action to prevent the spread of mold.  In its brief, First Midwest identified two additional acts: Debtors' failing to notify it they had abandoned their home; and Debtors' failing to notify it of

---

[13] Consequently, the Court does not need to address the fifth and final element under § 523(a)(2)(B), *i.e.*, intent to deceive.  *See Bush*, 696 F.2d at 644 n. 4.

[14] In *Patch*, the Court of Appeals was considering the dischargeability of an obligation to the debtor's son's estate arising out of his death under circumstances that can only be described as horrific.  *Patch*, 526 F.3d at 1178-79.

Re: *First Midwest Bank−Deerfield Branches v. Beeler*
February 10, 2009
Page 16

the flooding in their home. Assuming all the required elements were established, misstating the value of the Mustang could be a tort, *e.g.*, fraud or deceit, under South Dakota law. *See North American Truck & Trailer, Inc. v. M.C.I. Communication Services, Inc.*, 751 N.W.2d 710, 713-14 (S.D. 2008). However, First Midwest has not identified any duty Debtors owed it other than their contractual obligations under the various loan documents. Consequently, Debtors' shutting off the electricity to their home, failing to repair the water damage or otherwise taking action to prevent the spread of mold, failing to notify First Midwest they had abandoned their home, and failing to notify First Midwest of the flooding in their home are at most breaches of contract. A breach of contract is not a tort under South Dakota law. *Delka v. Continental Casualty Co.*, 748 N.W.2d 140, 148 (S.D. 2008) ("When the duties or obligations of the parties are contractual . . . a breach of those express or implied duties can give rise only to a cause of action in contract, not one in tort." (internal quotations omitted)); *Gakin v. City of Rapid City*, 698 N.W.2d 493, 501 (S.D. 2005) ("We have long recognized that [c]onduct that is merely a breach of contract is not a tort." (internal quotations omitted)).

To prevail under § 523(a)(6), First Midwest must therefore prove either Debtors desired to cause First Midwest not to receive payment in full on its claim or they were substantially certain First Midwest would not receive payment in full as a consequence of Debtor Carolyn Beeler's conduct in misstating the value of the Mustang. *Cf. Patch*, 526 F.3d at 1181. The test is a subjective one.

> Our *Geiger* opinion makes clear that in this circuit the "willful" element is a subjective one, requiring proof that the debtor desired to bring about the injury or was, in fact, substantially certain that his conduct would result in the injury that occurred.

*Patch*, 526 F.3d at 1180-81. Thus, neither a showing that it was substantially certain First Midwest would not receive payment in full nor a showing that Debtors should have known it was substantially certain First Midwest would not receive payment in full will suffice. *Geiger*, 113 F.3d at 852-53.

First Midwest has not pointed the Court to anything in the record that would support either a finding that Debtors desired to cause First Midwest not to receive payment in full on its claim or a finding that they were substantially certain, *i.e.*, they believed, First Midwest would not receive payment in full as a consequence of their acts. *Cf. Patch*, 526 F.3d at 1182-83. Debtors are therefore also entitled to judgment in their favor on the second count of First Midwest's complaint.

**11 U.S.C. § 727(a)(2).** Finally, First Midwest is asking the Court to conclude Debtors should be denied a discharge under 11 U.S.C. § 727(a)(2), which bars entry of a discharge if −

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under [the bankruptcy code], has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed −

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 17


>    (A) property of the debtor, within one year before the date of the filing of the petition; or
>
>    (B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2).

Not surprisingly, the elements of proof under §§ 727(a)(2)(A) and 727(a)(2)(B) are virtually the same, differing only in the requisite timing of the debtor's acts and nature of the property involved. To prevail under § 727(a)(2)(A), First Midwest must prove by a preponderance of the evidence:  (1) the acts about which it has complained were done within one year of the petition date; (2) the acts were those of Debtors; (3) the acts amounted to a transfer, removal, destruction, mutilation, or concealment of Debtors' property; and (4) the acts were done with an intent to hinder, delay, or defraud First Midwest, another creditor, or the case trustee. *Korte v. Internal Revenue Service* (*In re Korte*), 262 B.R. 464, 472 (B.A.P. 8th Cir. 2001).  To prevail under § 727(a)(2)(B), First Midwest must prove by a preponderance of the evidence:  (1) the acts about which it has complained were done on or after the petition date; (2) the acts were those of Debtors; (3) the acts amounted to a transfer, removal, destruction, mutilation, or concealment of property of the bankruptcy estate; and (4) the acts were done with an intent to hinder, delay, or defraud First Midwest, another creditor, or the case trustee. *See Fokkena v. Peterson* (*In re Peterson*), 356 B.R. 468, 476 (Bankr. N.D. Iowa 2006).

With respect to the last element under either § 727(a)(2)(A) or § 727(a)(2)(B), First Midwest must prove Debtors acted with actual intent to hinder, delay, or defraud; constructive intent cannot be the basis for denying Debtors a discharge. *Lovell v. Mixon*, 719 F.2d 1373, 1376-77 (8th Cir. 1983).  However, since proving the requisite actual intent with direct evidence is difficult, such actual intent may be inferred from the facts and circumstances of Debtors' conduct. *Korte*, 262 B.R. at 472-73 (quoting *Fox v. Schmit* (*In re Schmit*), 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

In its complaint, First Midwest identified several acts that it alleged implicated § 727(a)(2):  shutting off the electricity to Debtors' home; failing to repair the water damage from the flooding of Debtors' home; failing to prevent the spread of the mold that resulted from the flooding; and failing to notify First Midwest of the flooding. In its brief, it identified an additional act:  allowing the insurance on Debtors' home to be cancelled.

Based on the parties' recitations of the facts, the Court concludes there is no genuine issue of material fact regarding any of the elements under either § 727(a)(2)(A) or § 727(a)(2)(B). First Midwest has established each of the acts about which it has complained was done either within one year before, or on or after, the petition date (thus satisfying the first element of one or the other section) and each of those acts was that of Debtors (thus satisfying the second element).

With respect to the third element, the property involved was Debtors' home (which was Debtors' property within one year before the petition date and property

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 18

of the bankruptcy estate on and after the petition date).  Nothing in the record even remotely suggests Debtors transferred, removed, or concealed their home.  Consequently, First Midwest must show Debtors either destroyed or mutilated their home or allowed it to be destroyed or mutilated.  Neither § 727(a)(2) nor any other provision of the bankruptcy code defines "destroy" or "mutilate."  The Court must therefore resort to the dictionary to determine their ordinary meanings.

> In the absence of a statutory definition or clear contrary legislative intent, statutory terms are given their plain, ordinary, and commonly understood meaning.  This court often turns to a commonly used dictionary to ascertain a word's ordinary meaning.

*Schumacher v. Cargill Meat Solutions Corp.*, 515 F.3d 867, 871 (8th Cir. 2008) (citation omitted) (referring to Merriam-Webster's Collegiate Dictionary).  *See U.S. v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007) (referring to Black's Law Dictionary).

Merriam-Webster's Collegiate Dictionary defines "destroy" as "to ruin the structure, organic existence, or condition of" or "to ruin as if by tearing to shreds."  *Merriam-Webster's Collegiate Dictionary* 339 (11th ed. 2003).  The same dictionary defines "mutilate" as "to cut up or alter radically so as to make imperfect" or "to cut off or permanently destroy a limb or essential part."  *Id.* at 820.[15]  Neither definition seems to encompass the flooding and mold involved in this case.[16]  The flooding and mold would be better and more commonly described as damage, which can be repaired, not destruction or mutilation, which cannot.[17]  Congress could have easily included an act that would merely damage a debtor's property or property of the estate among the list of proscribed acts in § 727(a)(2), but it did not do so.  Under the circumstances, and in the absence of any contrary authority,[18] the Court therefore

---

[15] Black's Law Dictionary does not define "destroy," "destruction," or "mutilate."  However, it defines "mutilation" as:

> [t]he act or an instance of rendering a document legally ineffective by subtracting or altering – but not completely destroying – an essential part through cutting, tearing, burning, or erasing.

*Black's Law Dictionary* 1044 (8th ed. 2004).

[16] To the extent either definition could be stretched to encompass the flooding and mold, the Court must reject such a broad reading.  "The denial of a debtor's discharge is a 'harsh sanction,' therefore, the provisions of . . . § 727(a) are 'strictly construed in favor of the debtor.'"  *Floret, L.L.C. v. Sendecky* (*In re Sendecky*), 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002).

[17] First Midwest essentially conceded this point by referring to "water damage" – not "water destruction" or "water mutilation" – in its complaint and its briefs.

[18] First Midwest has not cited any case law defining "destroy" or "mutilate" in the context of § 727(a)(2), and the Court has not been able to locate any such case law.  However, the Court did find one case in which the accidental loss of records in

Re: *First Midwest Bank–Deerfield Branches v. Beeler*
February 10, 2009
Page 19

concludes Debtors' home was neither destroyed nor mutilated within the meaning of § 727(a)(2).

Moreover, with respect to the fourth and final element, First Midwest has not pointed the Court to anything in the record that would constitute direct evidence that Debtors actually intended to hinder, delay, or defraud First Midwest, another creditor, or the case trustee. It has likewise not pointed the Court to anything in the record that would permit the Court to infer such intent. Standing alone, the acts about which First Midwest has complained are not enough. First Midwest must point to extrinsic evidence of Debtors' intent. *Pher Partners v. Womble* (*In re Womble*), 289 B.R. 836, 853 (Bankr. N.D. Tex. 2003) ("There must be extrinsic evidence of the statutorily violative intent, whether it is to hinder, to delay, or to defraud creditors."); see *Panuska v. Johnson* (*In re Johnson*), 880 F.2d 78, 81 (8th Cir. 1989) (requiring extrinsic evidence of debtor's intent to defraud under § 727(a)(2)); and *Norwest Bank Nebraska v. Tveten* (*In re Tveten*), 848 F.2d 871, 874 (8th Cir. 1988) (likewise requiring extrinsic evidence of debtor's intent to defraud under § 727(a)(2)).[19] Even viewed in the light most favorable to First Midwest, the parties' recitations of the facts suggest only that Debtors wanted to – and did – surrender their home and may not have fully considered how their decision might affect their mortgage holders, including First Midwest.

First Midwest has not pointed the Court to anything in the record that would establish the last two required elements of proof under § 727(a)(2). Debtors are therefore also entitled to judgment in their favor on the third count of First Midwest's complaint.

The Court will enter an order granting Debtors' Motion for Summary Judgment.

NOTICE OF ENTRY
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota

Sincerely,

Charles L. Nail, Jr.
Bankruptcy Judge

cc:   adversary file (docket original and serve parties in interest)

---

a fire was held not to be "the purposeful destruction or mutilation contemplated by the Bankruptcy Code" in the context of 11 U.S.C. § 727(a)(3). *Ford Motor Credit Co. v. Branch* (*In re Branch*), 54 B.R. 211, 215 (Bankr. D. Colo. 1985) (citing *International Shoe Co. v. Lewine*, 68 F.2d 517 (5th Cir. 1934)).

[19] While both the *Tveten* and *Johnson* cases dealt specifically with the need for extrinsic evidence of a debtor's intent to defraud under § 727(a)(2), nothing in either case suggests the Eighth Circuit Court of Appeals would disagree with the court in *Womble* regarding a similar need for extrinsic evidence of a debtor's intent to hinder or delay under that section.